[Crim. No. 6454. Second Dist., Div. One. Nov. 16, 1959.]

THE PEOPLE, Respondent, v. RAYMOND D. SHEPHARD, Appellant.

298

Fredric A. Spindell, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney (Los Angeles), Jere J. Sullivan, and Harry Wood, Deputy District Attorneys, for Respondent.

LILLIE, J.—From a judgment of guilty of a violation of section 11500, Health and Safety Code (selling, furnishing and giving away heroin), after trial before the court without a jury, defendant appeals. He was charged by way of indictment, with one Clifford Barnes not before this court. The only issue before us is the sufficiency of the evidence to support the judgment, appellant claiming that the lower court's implied finding that he furnished the heroin handed by Barnes to the police officer is not justified by the evidence. That there is no merit to this contention is borne out by the record before us and the law of this state.

Viewed in the light most favorable to the judgment of conviction, the evidence discloses that defendant was introduced to Officer Renty, an undercover narcotics agent, by his codefendant, Barnes, on April 1, 1958, at approximately 1:30 p. m. at 24th and Second Avenue. Barnes said to the officer: "This is Chet. He is the guy that is going to turn the deal for you." However no conversation then actually occurred between defendant and the officer, but the defendant got into the car and directed Renty to drive to Cimmaron south of 54th Street. At that location, defendant left the car and said to the officer: "Keep driving around the block until I get back." He was gone approximately 40 minutes, during which the officer and Barnes continued to drive around the block. When defendant returned to the car he said: "Man, it sure scares me to walk around with this much stuff on me . . . the chick told me the police had been watching the place

in a panel truck, and I was afraid to come out. If the police caught me with this much stuff on me they would think I was dealing . . . drive back." The officer told him he would have to stop for gas, but defendant said: "No, man, you can't stop with all this stuff on me; drive me back to my pad." When they arrived at 24th and Second Avenue, Barnes and defendant got out of the car and went into the latter's apartment, leaving the officer in the automobile. Defendant did not return to the car, but Barnes came out and shortly thereafter gave the officer an envelope containing heroin.

Approximately two weeks later, around April 17th, Renty, accompanied by another officer (Nash) concealed in the trunk of his car, saw defendant alone at Second Avenue and 24th Street. Renty said to him: "I would like to go through the same transaction again. . . ." He asked him if he remembered the last deal they had and defendant said "yes." He said he would like to do it again and defendant said: "O.K., just a minute." He went upstairs to his apartment and upon his return to the car the officer gave him $125 in cash. Defendant counted the money, "kept feeling it" and said it seemed as if it had powder on it. The officer drove him at his direction to Cimmaron just south of 54th Street and defendant got out, walked south to an alley, turned into it and disappeared. He was gone 10 minutes. The officer waited in the car and when defendant returned he told him the woman hadn't that much "stuff" on hand and would have to go get it, and they would have to wait until she returned. They waited 20 minutes during which defendant asked him what he was going to do with so much "stuff." The officer replied he "was going to deal it" and they discussed it further, defendant asking "who is (was) going to deal it" for him. Thereafter, defendant returned to the alley, came back and told him: "The chick hasn't gotten back yet"; said he knew where she had gone and suggested they go there and rush "the deal up a little." They drove north on Arlington where they stopped and Officer Nash arrested defendant.

After his arrest he told police at the station that he knew Renty and had met him through Barnes. Renty then related to him the first transaction and where the three went, and defendant said "yes," he remembered going up there, but denied he handled any narcotics. However, he admitted he said "Man, this money feels like it's powdered."

At the trial defendant testified that he met Renty through Barnes, but there was no formal introduction and no con-

versation between them as related; that he went in the general direction of 54th Street and Cimmaron, somewhere on Arlington, where he got out of the car; and that he did not go to get narcotics but walked around the block, stopped at a store, bought cigarettes, returned 15 minutes later and said "Everything is O.K., I've got it." He denied any further conversation with the officer, and that he picked up, or gave any narcotics, for or to anyone. He further testified that he rode some place with Renty on April 18, 1958, and the officer told him "I would like to do that again; that he believed he referred to a narcotics transaction the officer had previously had with Barnes and since he had no money in his pocket he thought "here is a good way to make four or five dollars," on the pretense of doing something for him; that he tried to give him a "good showing" of doing something for his money, so he told Renty he recalled what happened the first time and told him to drive out where they were before; that he left the car at the location, walked around the block, came back to the car and stated he could not do it right now and suggested they go get some beer; and that when they returned to the car he walked around the block again, told the officer the same thing but that "he could go down there and speed it up." He denied he intended to get narcotics for Renty but admitted he took the money and had it in his pocket.

Appellant relies entirely upon *People* v. *Richardson*, 152 Cal.App.2d 310 [313 P.2d 651], but the factual situation in that case precludes its effective application here. There the officer gave $10 to one Dinky, who without conversation gave it to the appellant. Appellant then told Dinky and the officer to follow him to a certain location, and they did so; and when they arrived a question arose concerning where they could go and "fix." Appellant said "we will go down to my place," and all but the officer entered his residence. Later Dinky returned alone to the car where the officer was waiting and handed him a packet of heroin. Appellant denied any knowledge of, or relationship with, the transaction. The conviction was reversed because the only evidence connecting him with the narcotic given by Dinky to the officer was "that Dinky gave appellant $10.00."

Whereas there was no evidence in *People* v. *Richardson*, *supra*, from which it could be inferred that the appellant ever had narcotics in his possession or assisted in any way in obtaining the heroin, in the instant case the evidence raises a clear inference that defendant not only knew of the trans-

action between Barnes and the officer, but participated in the same and facilitated it by providing the narcotic; and actually physically obtained the heroin for them, and had it in his possession from the time he left Cimmaron and 54th Street to and including the time he was delivered to his residence by the officer, just before Barnes transferred the narcotic to Renty. This is the only reasonable inference that can be drawn from the officers' testimony:—that Barnes introduced defendant to Renty saying: "This is Chet. He is the guy that is going to *turn the deal* for you"; that defendant then directed the officer to drive to a certain location; that defendant disappeared into the alley at that location and upon returning said "Man, it sure scares me to walk around with this much stuff on me . . . the chick told me the police had been watching the place . . . I was afraid to come out. If the police caught me with this much stuff on me, they would think I was dealing"; that defendant said when the officer wanted to stop for gas, "No, man, you can't stop with all this stuff on me. Drive me back to my pad."; that Barnes, who accompanied defendant to his apartment, shortly thereafter gave the officer the narcotic; that on April 18 when Renty said he'd like to do it again, defendant replied "yes," accepted $125, was suspicious the money had been powdered, and directed him to the same location; that defendant said the woman didn't have $125 worth of "stuff" on hand and while they waited they discussed how the officer intended to "deal it"; that when arrested defendant admitted having been introduced to Renty by Barnes, said he remembered the transaction related by Renty, but said he did not handle any of the narcotics; and admitted he had said "Man, this money feels like it's powdered."

More applicable here is *People* v. *Henderson,* 121 Cal.App. 2d 816 [264 P.2d 225], the facts of which were somewhat weaker than those in the instant case, but sufficient to sustain the conviction of appellant Domingo on the theory that he aided and abetted the illegal possession of narcotics by his codefendant Henderson. In that case the officer observed appellant Domingo, seated on the driver's side, and one Henderson, in an automobile at Temple and Figueroa Streets, talking to a third person, who put his head in the window on Henderson's side, left, returned to Henderson's side of the car and walked away. Appellant drove a distance and was stopped by the officer who, as he approached the car, saw a package of heroin drop from Henderson's hands to his lap.

After his arrest, appellant was asked what he was doing around Temple and Figueroa. He replied that he had taken his friend there to "score for a capsule of heroin." Asked if he intended to split it with Henderson, he said he didn't know. Appellant contended there was no substantial evidence to sustain the conviction because he never had the capsule of heroin in his possession. In finding the argument devoid of merit the court said at page 817: ". . . pursuant to the provisions of section 31 of the Penal Code defendant, as an aider and abettor, was a principal in the crime which was committed (*People* v. *Bigelow,* 104 Cal.App.2d 380, 389 [11] et seq. [231 P.2d 881]. In the present case under defendant's admission he clearly aided and abetted his codefendant in obtaining and possessing the capsule of heroin. Therefore he was properly found guilty as a principal (*cf. People* v. *Borrego,* 211 Cal. 759, 764 [297 P. 17])."

The state of the record before us compels our conclusion that the conviction of defendant must be sustained on the theory he aided and abetted his codefendant Barnes in the selling, furnishing or giving away of a narcotic to the officer—for all persons concerned in the commission of a crime, whether they committed the act constituting the offense, or aided and abetted in its commission, are principals under our law (Pen. Code, § 31; *People* v. *Hopkins,* 101 Cal.App.2d 704 [226 P.2d 74]).

As to his defense offered in the court below, it is obvious that the defendant's version of what occurred exculpating him was rejected by the trial court and that it accepted the testimony of the prosecuting witnesses (*People* v. *Borrego,* 211 Cal. 759 [297 P. 17]). The trier of the fact not only had the right, but the duty to weigh the evidence, determine the credibility of witnesses and resolve any factual conflict, as well as draw proper and reasonable inferences from the evidence (*People* v. *Flummerfelt,* 153 Cal.App.2d 104 [313 P.2d 912]; *People* v. *Hopper,* 168 Cal.App.2d 406 [336 P.2d 28]), which conclusions this court will not disturb (*People* v. *Pruitt,* 55 Cal.App.2d 272 [130 P.2d 767]).

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.